WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deborah Dieter-Bradford, | No. CV 16-00456-TUC-BPV |
| Plaintiff, | **ORDER** |
| v. | |
| Nancy A. Berryhill, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

Plaintiff Deborah Dieter-Bradford has filed the instant action pursuant to 42 U.S.C. § 405(g) seeking review of the final decision of the Commissioner of Social Security. (Doc. 1). The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. (Doc. 11). *See* 28 U.S.C. § 636(c). Pending before the Court are Plaintiff's Opening Brief (Doc. 14), Defendant's Brief (Doc. 15), and Plaintiff's Reply Brief (Doc. 16). For the following reasons, the Court remands this matter for an immediate calculation and award of benefits.

## I. PROCEDURAL HISTORY

On June 28, 2012, Plaintiff protectively filed applications for disability benefits and for supplemental security income, alleging disability since March 28, 2004, due to chest pains, asthma, anxiety, depression, metal plate in right wrist, high blood pressure, acid reflux, and possible chronic obstructive pulmonary disease.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted as the named defendant in place of Carolyn W. Colvin.

(Transcript/Administrative Record ("Tr.") at 45, 395, 402, 430). Plaintiff's applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*See* Plaintiff's Brief at 2 (citing Tr. at 157, 165, 173)). On June 13, 2013, Plaintiff, who appeared with counsel, and a vocational expert ("VE") testified before ALJ Peter J. Baum. (Tr. at 78-115). On June 17, 2013, the ALJ issued his decision denying Plaintiff's request for benefits. (Tr. at 133-143). Thereafter, Plaintiff requested review by the Appeals Council and submitted additional evidence. (Plaintiff's Brief at 2 (citing Tr. at 267, 269, 278-80, 281-305)). On June 26, 2014, the Appeals Counsel granted Plaintiff's request for review and remanded her claims to the ALJ for readjudication. (Tr. at 149-53).

On January 5, 2015, Plaintiff, who appeared with counsel, and a VE testified before the ALJ. (Tr. at 53-115). On February 3, 2015, the ALJ issued a decision once again denying Plaintiff's request for benefits. (Tr. at 26-45). Thereafter, the Appeals Council denied Plaintiff's request for review, thus making the ALJ's January 5, 2015 decision the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6). Plaintiff then initiated the instant action.

## II. PLAINTIFF'S BACKGROUND

Plaintiff was born on December 12, 1970 and was 33 years of age on her alleged disability onset date. (Tr. at 58). Plaintiff repeated the second grade twice. (Tr. at 84). She testified that she "had a special learning disability. . . I had a speech problem[]" and she was placed in speech therapy. (Tr. at 84; *see also* Tr. at 431 (Plaintiff's disability report does not indicate that she attended special education classes[2])). When in school, Plaintiff also received tutoring in reading. (Tr. at 84-85). Plaintiff quit school after the eighth grade. (Tr. at 58). Plaintiff also testified that she suffered from seizures as a child. (Tr. at 59).

Plaintiff has a driver's license. (Tr. at 85). She testified that when taking the test

---

[2] "An individual working with Plaintiff's attorney completed this form." (Defendant's Brief at 7 n.1).

for her driver's license, she "read it over and over….And then I did ask the lady at the DMV, if what was the version of like I can't remember what the one was. But I missed like two or three of them….But she was nice. Then she asked me[.] She says, well I know you know this. So she read it in different terms. And then I got it right." (Tr. 85-86). Therefore, Plaintiff passed the test on her first try. (Tr. at 86).

Plaintiff also testified that reading "makes my heads [sic] hurts [sic]. And then I walk away. And then I'll come back later and finish it." (Tr. at 98). When asked why she walks away, Plaintiff responded: "Extraction [sic], or just I ain't in the mood, or something." (*Id.*).

Plaintiff's past work includes: making and shipping pellet guns from June 3, 2002 to August 21, 2002; working as a riveter at Gray Metal Productions from December 2002 through March 2004; working in screening and painting from April 28, 2004 to May 10, 2004; working as a cashier at McDonald's from November to December 2006; inspecting and sorting at a food distribution company in August 2008; working as a cashier from October to December 2008; and assembly work at a foam company in 2009. (Tr. at 60, 89, 449; 475). Additionally, at some unspecified time, Plaintiff worked at a car dealership. (*See* Tr. at 61-62).

Plaintiff worked for the longest duration at Gray Metal Products where her work involved "[r]iveting, bender…it bends in the steel in the air duct things…." (Tr. at 89). She "sometimes" worked by herself. (Tr. at 68) She was eventually criticized at the job and experienced stress, but "I was getting abused[3] at the time, and I would just stick to it so I didn't have to go home." (*Id.*). Plaintiff ultimately walked off the job because her "boss grabbed me. And I kind of got mad….I walked off the job because I didn't want to hit her." (Tr. at 90; *id.* (Plaintiff's boss grabbed her out of anger)).

When Plaintiff worked as a cashier, she had to have everything written down

---

3 Plaintiff's statements in the record reflect that she has been married three times, each of her husbands was abusive to her, and her third husband violently raped her. (Tr. at 282). Plaintiff's first marriage was approximately at age 18 and lasted six months. (*Id.*). She was married the second time at approximately age 22, and the third time when she was about 24 years of age. (*Id.*).

"because I didn't remember the buttons or anything." (Tr. at 89). She also testified about having difficulty with "know[ing] how much money you had in … [the cash register] and how many sales you made on the receipt. Then you're subtracting [inaudible] and stuff." (Tr. at 61).

Plaintiff's work manufacturing pellet guns involved "put[ting] the guns together, or you'd have to test and see if the little cartridge was good or not….The boss said I wasn't quick enough. You had to have a quota or something like that." (Tr. at 60).

Plaintiff also tried working at a car dealership as a sales and lease consultant for about a month, but she had difficulty with the paperwork involving "[h]ow much it was supposed to be sold for, the car. And the paperwork to see if they were approved." (Tr. at 61). Co-workers had to help her. (Tr. 62).

Plaintiff's anxiety and dislike of being around a lot of people prevent her from looking for work, and she does not think she can work full time because of her memory and crying spells. (Tr. at 91, 100; *see also* Tr. at 58 (Plaintiff has not looked for work since June 2013 "[b]ecause I stay inside because I don't want to be judged. And plus too much stress."); Tr. at 62-63 (Plaintiff cries when she is in stressful situations); Tr. 97-98 (crying spells)). She also suffers from depression. (Tr. at 95). Plaintiff does not handle stress or criticism well: "If somebody raises their voice, or just in a bad [sic], and they look at me, it makes me want to cry." (Tr. at 97). Plaintiff does not trust people because she feels "they are going to come after me, or judge me." (Tr. at 64; *see also* Tr. at 66 (Plaintiff fears people are going to hurt her)). Plaintiff experiences anxiety when "something doesn't go right, or if I go over the things and I didn't understand it, I get all worked up, and my chest starts pounding and my hands start getting sweaty." (Tr. at 65-66).

Additionally, Plaintiff, who is right-handed, has a metal plate in her right wrist and her wrist hurts if she uses it too much. (Tr. at 95-96). Plaintiff also has suffered a dislocated rotator cuff in her left shoulder and it bothers her to raise her elbow. (Tr. at 96).

Although Plaintiff has had a checking account, it was closed because of over-drafts. (Tr. at 68-69). At the time of the 2015 hearing, Plaintiff lived with her boyfriend who paid the bills. (Tr. at 69).

Plaintiff's medications include fluoxetine for depression, prozan for anxiety, bupropion for mood disorder, cyclobenzaprine and/or prednisone for pain, in addition to medications for asthma, acid reflux, and high blood pressure. (Tr. at 433, 456).

## III. THE ALJ'S DECISION

### A. CLAIM EVALUATION

Whether a claimant is disabled is determined pursuant to a five-step sequential process. *See* 20 C.F.R. § 416.920, 416.1520. To establish disability, the claimant must show that: (1) she has not performed substantial gainful activity since the alleged disability onset date ("Step One"); (2) she has a severe impairment(s) ("Step Two"); and (3) her impairment(s) meets or equals the listed impairment(s) ("Step Three"). "If the claimant satisfies these three steps, then the claimant is disabled and entitled to benefits. If the claimant has a severe impairment that does not meet or equal the severity of one of the ailments listed…, the ALJ then proceeds to step four, which requires the ALJ to determine the claimant's residual functioning capacity (RFC)[4]….After developing the RFC, the ALJ must determine whether the claimant can perform past relevant work…. If not, then at step five, the government has the burden of showing that the claimant could perform other work existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience." *Dominguez,* 808 F.3d at 405.

### B. The ALJ's Findings in Pertinent Part

The ALJ determined that Plaintiff "has the following severe impairments: affective disorder [and] low intellectual capacity[.]" (Tr. at 32). The ALJ found that Plaintiff's impairments did not meet or equal a listed impairment.[5] (Tr. at 38-40). The

---

[4] "The RFC is defined as 'the most' the claimant can do, despite any limitations." *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015), *as amended* (Feb. 5, 2016) (citation omitted).

[5] In making this assessment, the ALJ found that Plaintiff had: mild restriction in

ALJ further found that Plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform no overhead (elbow above plane of the shoulder) lifting with her left, non-dominant arm, she is limited to unskilled work; she can work in proximity, but not in conjunction with others.

(Tr. 40). After taking evidence from the VE, the ALJ determined that Plaintiff could perform her "past relevant work as a hand riveter." (Tr. 44-45). Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act from March 28 2004 through the date of the ALJ's decision. (Tr. at 45).

## IV. DISCUSSION

Plaintiff argues that the ALJ's decision is erroneous because substantial evidence does not support his findings: (1) that Plaintiff did not meet the requirements of Listing 12.05C at Step Three; (2) that Plaintiff could perform past relevant work; (3) concerning examining psychologist Dr. Lin's opinion about Plaintiff's social functioning; and (4) rejecting Dr. Crago's opinion about Plaintiff's mental limitations. Defendant counters that the ALJ's opinion should be affirmed because it is free from error and based upon substantial evidence.

### A. STANDARD

The court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). The "court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

---

activities of daily living; moderate difficulties in social functioning; and moderate difficulties with concentration, persistence or pace. (Tr. at 38).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Matney,* 981 F.2d at 1019. However, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett,* 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Id.; Garrison v. Colvin,* 759 F.3d 995, 1009 (9th Cir. 2014). The court shall "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

**B.    PLAINTIFF MEETS LISTING 12.05C**

Plaintiff argues that the ALJ erred at his Step Three determination that Plaintiff did not meet or equal Listing 12.05C for intellectual disability.

"Conditions contained in the 'Listing of Impairments' are considered so severe that they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs." *Lester v. Chater,* 81 F.3d 821, 828 (9th Cir. 1995) (citation and footnote omitted); *see also Sullivan v. Zebley,* 493 U.S. 521, 532 (1990), *superseded by statute on other grounds s stated in Kennedy v. Colvin,* 738 F.3d 1172, 1174 (9th Cir. 2013), (The Listings were "designed to operate as a presumption of disability that makes further inquiry [under the sequential

analysis] unnecessary."); 20 C.F.R. §§ 404.1520(d); 416.920(d). Therefore, claimants "are conclusively disabled if their condition either meets or equals a listed impairment." *Lester,* 81 F.3d at 828.

To be considered disabled under Listing 12.05C, titled "Intellectual Disability"[6], Plaintiff must show the following:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairments before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> * * *
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.C. The parties agree that to establish disability under Listing 12.05C, Plaintiff must show: (1) evidence of significantly sub-average general intellectual functioning with deficits in adaptive functioning, which were initially manifested before age 22; (2) a valid I.Q. of 60 through 70 inclusive; and (3) an additional and significant work related limitation of function[7]. (*See* Plaintiff's Brief at 7 (citing *Kennedy,* 738 F.3d at 1176); Defendant's Brief at 6 (citing *Kennedy,* 738 F.3d at

---

[6] "The 'intellectual disability' impairment listed under §12.05 was formerly referred to as 'mental retardation.'" *Kennedy,* 738 F.3d at 1176 n.1. The change in terminology was not substantive, but instead had the purpose of removing any "negative connotation" associated with the term "mental retardation." 78 Fed. Reg. 46499-01 (Aug. 1, 2013). *See also Kennedy,* 738 F.3d at 1176 n.1.

[7] Under the Listing:
> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a 'severe' impairment(s) as defined in §§404.1520(c) and 416.920(c).

20 C.F.R. 404, subpt. P, app. 1, pt. A, §12.00(A). Defendant does not dispute that 12.05C's third requirement of an "additional" impairment is satisfied by the ALJ's finding that Plaintiff's anxiety is a severe impairment, (*see* Tr. at 32 (plaintiff's affective disorder constituted a severe impairment) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). (*See generally* Defendant's Brief).

- 8 -

1176)).

## 1. PERTINENT MEDICAL EVIDENCE

On December 30, 2009, Plaintiff's primary care provider, Anthony Witte, M.D., indicated that Plaintiff suffered from depression and that she was moderately limited in: maintaining attention or concentration, interacting appropriately with others; maintaining socially appropriate behavior without exhibiting behavior extremes; and the ability to function in a work setting at a consistent pace. (Tr. at 564). He opined that Plaintiff was not limited in understanding, remembering or carrying out instructions, making simple decisions, or maintaining basic standards of personal hygiene and grooming. (*Id.*). In January 2012, Dr. Witte completed a form indicating that Plaintiff had no physical or mental limitations. (Tr. at 611 (last examination had been in November 2011)). In June 2012, Dr. Witte indicated that Plaintiff was moderately limited in understanding and remembering instructions, carrying out instructions, maintaining attention or concentration, and ability to function in a work setting at a consistent pace. (Tr. 761). He further stated that Plaintiff "may be disabled through mental health but this would need to be discussed with her counselor." (*Id.*).

In August, 2011, Plaintiff presented to Kavitha Finnity, Ph.D., for a consultative psychological evaluation. (Tr. at 556-59). At that time, Plaintiff had been in treatment since 2010, attending psychotherapy weekly and appointments for medication management once every one to two months. (Tr. at 556). Plaintiff reported having seizures as a toddler. (*Id.*). She also reported "depressive symptoms including dysphoric mood and irritability. She has loss of interest, loss of energy, and social withdrawal. She has excessive anxiety with worrying. She reports auditory hallucinations in the past. She is currently not experiencing them. She reports difficulty with short-term memory." (*Id.*). Dr. Finnity estimated Plaintiff's cognitive functioning "to be average to below average. General fund of information is appropriate to experience." (Tr. at 558). Dr. Finnity indicated that Plaintiff "is able to dress, bathe, and groom herself. She is able to cook, clean, and do laundry. She can shop and manage her money. She socializes

occasionally with friends.  She has a good relationship with her family.  She enjoys watching TV and coloring." (*Id.*).  Dr. Finnity's diagnoses included depressive disorder nos and anxiety disorder nos. (*Id.*).  She opined that Plaintiff:

> can follow and understand simple directions and simple tasks.  She can maintain attention and concentration and a regular schedule.  She can learn new tasks and perform complex tasks with supervision. She can make appropriate decisions.  She can relate with others.  She has some difficulty dealing with stress.

(*Id.*).

In August 2012, Plaintiff presented to Yu-Ying Lin, Ph.D., for a consultative psychological evaluation. (Tr. 715-19).  Plaintiff reported depressive and anxiety-related symptoms. (Tr. at 715-16).  On examination, Dr. Lin found that Plaintiff's attention and concentration "[a]ppeared to be moderately impaired due to limited intellectual functioning and depression." (Tr. at 717).  Examination also reflected that Plaintiff's recent and remote memory skills "[a]ppeared to be impaired due to depression and limited intellectual functioning." (*Id.*).  Her "[i]ntellectual functioning appeared to be below average." (*Id.*).  Dr. Lin's diagnoses included bipolar disorder nos, panic disorder without agoraphobia, and alcohol abuse in early remission. (Tr. at 718).  He opined that Plaintiff

> can follow and understand simple directions and instructions.  She can perform simple tasks independently.  She can maintain attention and concentration.  She is able to maintain a regular schedule.  She can learn new tasks.  She can perform complex tasks independently.  She may have difficulty making appropriate decisions.  She cannot relate adequately with others.  She cannot appropriately deal with stress.  Difficulties are caused by lack of motivation and stress related problems.

(Tr. at 717).

On July 19, 2013, Plaintiff presented to R. Robert Crago, Ph.D., upon referral by her attorney to for examination. (Tr. at 281).  Dr. Crago administered the Wechsler Adult Intelligence Scale-III ("WAIS-III"), which showed that Plaintiff had a verbal IQ of 66, a performance IQ of 78, and a full scale IQ of 69. (Tr. at 283).  Dr. Crago's "DSM-IV[8]

---

8  DSM-IV refers to the American Psychiatric Association's *Diagnostic and*

Multiaxial Assessment" included: mild mental retardation; major depression, moderate to severe; anxiety disorder NOS; personality disorder NOS with dependent and avoidant features; headaches; asthma; allergy; low intellectual capacity; financial stress; and a current Global Assessment of Functioning score of 50 which is indicative of "significant impairment in social and occupational functioning." (Tr. at 287).

> Dr. Crago stated that:
> [Plaintiff's] intellectual capacity (Full Scale 69) places her in the mild mental retardation category. Historically this is roughly equivalent to what used to be referred to as 'educable.' As a group, people of this level of intellectual capacity typically develop social and communication skills during the preschool years, have minimal impairment to sensorimotor areas, and an [sic] often are not distinguishable from children without Mental Retardation until a later age. By their late teens they can acquire academic skills up to approximately junior high school level. During their adult years they may have social and vocational skills adequate for minimum self-support but they may need supervision, guidance, or assistance, especially when under unusual social or economic stress. With appropriate support, they can usually live successfully in the community, either independently or in a supervised setting.[9]

(Tr. 287-88 (emphasis omitted)). In noting that Plaintiff "has failed at almost every job, usually being fired for difficulties of failure to perform efficiently or without errors[,]" Dr. Crago pointed out that individuals with such limited intellectual capacity "have a great deal of difficulty in any work setting…" that did not involve a high level of structure and guidance. (Tr. at 288). Also consistent with such limited intellectual capacity, Plaintiff struggled in school, did not progress past the eighth grade, and is unable to maintain serious intimate relationships. (*Id.*). "She found herself repeatedly in abusive relationships with men who exploited her. Her low level of intellectual capacity made her (and continues to make her) vulnerable and dependent." (*Id.*).

Dr. Crago opined that Plaintiff was disabled due to limited intellectual capacity, chronic problems with depression, and inadequate coping skills to form quality lasting

---

*Statistical Manual of the American Psychiatric Association* (Fourth edition) ("DSM-IV").

⁹ Dr. Crago's explanation about "mild retardation" essentially paraphrases that found in the DSM-IV. *See* DSM-IV at 41.

relationships. (Tr. at 288)  He found that Plaintiff met the Listings for 12.05 (Intellectual Disability) and 12.08 (Personality Disorders).  (Tr. at 292).  Dr. Crago also indicated that Plaintiff would be unable to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. at 290).  Dr. Crago also indicated that Plaintiff could not carry out detailed instructions.  (*Id.*; *see also* Tr. at 290-91 (Dr. Crago's "Medical Source Assessment (Mental)" indicating areas where Plaintiff's ability to function was limited)).

## 2.   ANALYSIS

The issue in contention is whether the ALJ adequately determined that Plaintiff failed to demonstrate significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested before she was 22 years of age. (*See* Defendant's Brief at 6-9).  "The requirement of early onset, and the related reference to the 'developmental period,' are 'intended to limit coverage to an innate condition, rather than a condition resulting from a disease or accident in adulthood.'" *Huber v. Astrue,* 2010 WL 4684021, at *3 (D. Ariz. Nov. 12, 2010) (quoting *Gomez v. Astrue*, 695 F.Supp.2d 1049, 1061 (C.D. Cal. 2010)).

> In assessing Dr. Crago's opinion, the ALJ stated that
> the only intelligence testing was performed in anticipation of the claimant's receipt of disability benefits, following an initial decision denying those benefits.  I am referring to Dr. Robert Crago's report of July 2013.  There are no prior records that support the finding of significantly subaverage intelligence with deficits manifested before age 22.  Of all the treating and examining notes, only consultative examiners Yu-Ying Lin and Kavith Finnity mentioned that the claimant's functioning might be below average.

(Tr. at 39).  The ALJ went on to point out that Drs. Lin and Finnity reached similar conclusions that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and perform complex tasks independently.  (Tr. at 39).

The ALJ further stated that "[t]he claimant was 42 years old at the time of Dr. Crago's intellectual functioning testing.  There is no evidence to support a finding of

functional deficits due to below average intellect prior to the claimant attaining age 22. In contrast to the requirement of listing 12.05, as noted above, the claimant has demonstrated the ability to live independently and obtain and sustain employment, even since she alleges she became disabled in 2004." (Tr. at 39-40). With specific regard to Listing 12.05C, the ALJ stated that "[a]lthough recent testing indicates an IQ within the required range, the listing does not apply, because the functional deficit criteria have not been met." (*Id.*).

> Later in his decision, the ALJ also stated that:
>> While the claimant had low IQ scores reported by Dr. Crago, this testing occurred long after the claimant's alleged onset of disability (2004), her date last insured for Title II benefits (2005) and the filing of her application (2012). Prior to the finding of low intellectual functioning, the claimant sustained unsheltered, unskilled, substantial gainful activity for at least a year, from 2003-2004.
>> Additionally, evidence of intellectual functioning is found in the fact that the claimant passed her driver's license test on her first attempt. As noted in detail above, the claimant does not meet or equal the 'adaptive functioning deficits' of listing 12.05. Dr. Robert Crago did not comment on her adaptive functioning. I note, however, that the claimant testified that she had her checking account closed for bounced checks.

(Tr. at 41-42) (citations omitted). The ALJ gave limited weight to Dr. Crago's opinion that Plaintiff met Listing 12.05 for the same reasons that he determined that Plaintiff failed to meet the Listing. (Tr. at 43).

The ALJ is in error to any extent that he suggests that Plaintiff's IQ, although meeting the listing, is of little value because it was assessed during "recent testing".[10] (Tr. at 40). "[A] claimant is not required to produce an IQ score ascertained prior to the age of 22 in order to meet the listing." *Mathews v. Colvin,* 170 F.Supp. 3d 1277, 1281

----

[10] Defendant does not contest the validity of the results. However, to any extent that the ALJ attempted to call Dr. Crago's report into doubt because the doctor examined Plaintiff "in anticipation of . . ." her application for benefits, (Tr. at 39), the Ninth Circuit is clear that "[t]he purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them." *Lester,* 81 F.3d at 832. Absent "actual improprieties" cited by the ALJ, *Saelee v. Chater,* 94 F.3d 520, 523 (9th Cir. 1996), "[a]n examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner." *Lester,* 81 F.3d at 832 (citation omitted).

(E.D. Cal. 2016) (citation omitted); *cf. Maresh v. Barnhart,* 438 F.3d 897, 900 (8th Cir. 2006) ("True, the [claimant's IQ] score was recorded after the developmental period [at age 37], but a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.") (internal quotation marks and citation omitted); *Hodges v. Barnhart,* 276 F.3d 1265, 1269 (11th Cir. 2001) (the Commissioner has "acknowledged that evidence of intelligence testing during the developmental years would *not* be required to meet the criteria of Listing 12.05") (citing 65 Fed.Reg. 50746, 50772 (Aug. 20, 2000)) (emphasis in original).  Further, that other doctors did not indicate below average functioning in no way undermines Plaintiff's claim given that Drs. Lin and Finnity, who did evaluate cognitive functioning on examination, found Plaintiff "to be below average" (Tr. at 717 (Dr. Lin)), and "average to below average" (Tr. at 558 (Dr. Finnity)).  Most importantly, Dr. Crago, who examined Plaintiff subsequent to Drs. Lin and Finnity, was the only doctor to specifically evaluate Plaintiff's IQ and this testing essentially confirmed Drs. Lin's and Finnity's assessments with regard to cognitive functioning.

Defendant argues that the ALJ established that Plaintiff "did not currently show deficits in adaptive functioning due to intellectual functioning[]" because she was able to obtain and sustain employment and live independently, which included cooking, cleaning, laundry, shopping, driving, managing her own money, and attending to her personal care.  (Defendant's Brief at 8).  Defendant also argues that "[t]he ALJ reasonably found that Plaintiff did not demonstrate current deficits in adaptive functioning or such deficits before age 22."  (*Id.* at 9).  Thus, according to Defendant, the ALJ properly concluded that Listing 12.05C is not met.

### a.  DEFICITS IN ADAPTIVE FUNCTIONING

Although Listing 12.05C "requires that the plaintiff have 'deficits' in 'adaptive functioning,' it neither defines what level of limitation or restriction gives a person a 'deficit' in this area, nor does it define what it means by 'adaptive functioning.' There appears to be no statute, regulation or binding case authority defining either term."

*Flores v. Colvin,* 2016 WL 1162698, *4 (E.D. Cal. Mar. 24, 2016). Plaintiff cites to the criterion set out in the DSM-IV, which Dr. Crago applied and which requires "significant limitations in adaptive functioning in at least two of the following [eleven] skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." (Plaintiff's Brief at 12 (quoting DSM-IV at 39, 41); Reply at 3-5). According to Defendant, "[a]daptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." (Defendant's Brief, at 6 (citing DSM-V at 37).

The Commissioner, in recognizing that the "age of onset and the method of measuring the required deficits in adaptive functioning differ among the orginaizations[,]" has declined to adopt the definition of "mental retardation" set out in the DSM. *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 Fed. Reg. 20018-01, 20,022 (April 24, 2002). Instead, the Commissioner has stated that the Social Security Administration's "definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations[,]" which includes the American Psychiatric Association's DSM. *Id.* Although some courts have declined to apply the DSM definition in evaluating deficits in adaptive functioning under Listing 12.05, *see e.g., Maresh,* 438 F.3d at 899 (citing 67 Fed.Reg. at 20,022), *Flores,* 2016 WL 1162698, at *5 n.8; *Hightower v. Colvin,* 2015 WL 5008713, at * 6 (D.S.C. Aug. 20, 2015) (same)[11], others have applied it, *see Askew v. Berryhill,* 2017 WL 3113413, at *4-5 & n.7 (July 20, 2017) (citing *Novy v.*

___

[11] Generally, courts not applying the DSM definition have looked to the language of Listing 12.00 to determine that "'adaptive functioning' includes, at a minimum, (1) activities of daily living, (2) maintaining social relationships, and (3) maintaining concentration, persistence or pace." *Flores,* 2016 WL 1162698, at *6 (citing Listing 12.00C(4); *see also id.* at *5 (citing Listing 12.00C(1)); *Hightower,* 2015 WL 5008713, at *7 (same and also citing the Social Security Administration's Program Operations Manual DI 24515.06(D)(2)). The discussion, *infra,* supports the conclusion that if this standard were applied, Plaintiff would demonstrate deficits in adaptive functioning and the ALJ's finding to the contrary was erroneous.

*Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (for the premise that "the Seventh Circuit has applied the definition provided in the [DSM]…albeit prior versions[]" when evaluating deficits in adaptive functioning under Listing 12.05) (footnote omitted); *Templeman v. Colvin,* 2016 WL 8672912, * (D. Or. Oct. 14, 2016) (citing *Jones v. Colvin,* 149 F.Supp. 3d 1251, 1257 n. 3 (D. Or. 2016)); *Ligon v. Colvin,* 2015 WL 5167873 (M.D. Tenn. Sept. 3, 2015); *Taylor v. Astrue,* 2011 WL 4055243, at *14 (E.D. Cal. Sept. 12, 2011). Here, both parties rely on the DSM, albeit different versions, to support their respective positions. As discussed, *infra,* the substantial evidence of record supports the conclusion that the ALJ's decision was erroneous regardless which version of the DSM is applied.

To the extent that the ALJ characterizes Dr. Crago's report as failing to "comment on [Plaintiff's] adaptive functioning", (*see* Tr. at 42), the ALJ is mistaken. Dr. Crago indicated that his diagnosis of mild mental retardation was made pursuant to the "DSM-IV Multiaxial Assessment" and he cited the DSM-IV classification number for that impairment. (Tr. at 287); *see also* DSM-IV at 41. "[T]o diagnose a claimant with an intellectual disability, the medical source must first determine the claimant has deficits in adaptive functioning." *Ligon,* 2015 WL 5167873, at *4. As set out above, the DSM-IV requires deficits in adaptive functioning to establish intellectual disability. Thus, Dr. Crago's diagnosis pursuant to the DSM-IV necessarily supported the conclusion that he determined that Plaintiff demonstrated deficits in adaptive functioning. *See id.* (diagnosis of mild intellectual disability, in and of itself, indicated that the plaintiff demonstrated deficits in adaptive functioning as required by Listing 12.05). Moreover, the ALJ was not left with having to assume that Dr. Crago found such deficits based on the diagnosis, alone. Dr. Crago, consistent with the DSM-IV criterion, specifically commented on Plaintiff's social/interpersonal skills, poor work history including her difficulty in "maintain[ing] even menial jobs"[12], and poor academic history. (*See* Tr. 288; *see also*

---

[12] In pointing out that Plaintiff's poor work history correlated with the diagnosis of mild mental retardation, Dr. Crago stated that "[u]sually individuals with such limited intellectual capacity have a great deal of difficulty in any work setting that doesn't involve a high level of structure and guidance, and a patient and forgiving employer. It is noteworthy that Ms. Dieter-Bradford reports that she has failed at almost every job,

Plaintiff's Brief at 13 (citing Tr. 288)).   Dr. Crago also assessed Plaintiff with deficiencies in "sustained concentration and persistence", understanding and memory, maintaining social functioning, and "concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)." (Tr. at 290-91, 299).   Thus, contrary to the ALJ's finding, Dr. Crago indicated that Plaintiff had deficits in adaptive functioning.

Additionally, under the DSM-V, (which was published two months before Dr. Crago evaluated Plaintiff), "[a]daptive functioning involves adaptive reasoning in three domains: conceptual[13], social[14], and practical[15]."   DSM-V, Intellectual Disability, *available at* http://dsm.psychiatryonline.org; *see also Allen v. Colvin,* 2013 WL 5651419, *4 n.3 (C.D. Cal. Oct. 15, 2013) (referencing DSM-V's May 2013 publication date).   A

---

usually being fired for difficulties of failure to perform efficiently or without errors."  (Tr. at 288).

[13]  In the conceptual domain, for an individual with mild intellectual disability, "there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations.  In abstract thinking, executive function (*i.e.*, planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills (*e.g.*, reading, money management), are impaired.  There is a somewhat concrete approach to problems and solutions compared with age-mates."   DSM-V (Intellectual Disability, Table 1), *available at* http://dsm.psychiatryonline.org.

[14]  In the social domain, an individual with mild intellectual disability, "is immature in social interactions [compared with typically developing age-mates]. For example, there may be difficulty in accurately perceiving peers' social cues. Communication, conversation, and language are more concrete or immature than expected for age. There may be difficulties regulating emotion and behavior in age-appropriate fashion; these difficulties are noticed by peers in social situations. There is limited understanding of risk in social situations; social judgment is immature for age, and the person is at risk of being manipulated by others (gullibility)."   DSM-V (Intellectual Disability, Table 1), *available at* http://dsm.psychiatryonline.org.

[15]  In the practical domain, an individual  with mild intellectual disability "may function age-appropriately in personal care. Individuals need some support with complex daily living tasks in comparison to peers. In adulthood, supports typically involve grocery shopping, transportation, home and child-care organizing, nutritious food preparation, and banking and money management. Recreational skills resemble those of age-mates, although judgment related to well-being and organization around recreation requires support. In adulthood, competitive employment is often seen in jobs that do not emphasize conceptual skills. Individuals generally need support to make health care decisions and legal decisions, and to learn to perform a skilled vocation competently. Support is typically needed to raise a family."  DSM-V (Intellectual Disability, Table 1), *available at* http://dsm.psychiatryonline.org.

person demonstrates deficits in adaptive functioning consistent with intellectual disability

"when at least one domain of adaptive functioning…is sufficiently impaired that ongoing

support is needed in order for the person to perform adequately in one or more life

settings at school, at work, at home, or in the community."  *Id.*  Dr. Crago's comments in

his report about Plaintiff's poor work history and social/interpersonal skills are consistent

with a determination of deficits of adaptive functioning with regard to the social and

practical domains under the DSM-V.

In sum, the ALJ's rejection of Dr. Crago's opinion with regard to Plaintiff's

intellectual disability for the reason that Dr. Crago did not comment on deficits in

adaptive functioning does not constitute a sufficient reason to reject Dr. Crago's

diagnosis and findings with regard to the issue of Plaintiff's intellectual disability under

12.05C.  *See Lester,* 81 F.3d at 830-31 ("the Commissioner must provide clear and

convincing reasons for rejecting the uncontradicted opinion of an examining

physician….[T]he opinion of an examining doctor, even if contradicted by another

doctor, can only be rejected for specific and legitimate reasons that are supported by

substantial evidence in the record.") (internal quotation marks and citation omitted).

Instead, Dr. Crago's assessment supports the finding that Plaintiff demonstrates such

deficits.  Moreover, the ALJ's own findings that Plaintiff had moderate difficulties in

social functioning and with regard to concentration, persistence, and pace, (*see* Tr. at 38),

also negate the ALJ's conclusion that Plaintiff did not exhibit deficits in adaptive

functioning.[16]  *See id.* (the ALJ also noted that Plaintiff had mild restrictions with regard

to activities of daily living).  This is especially so given that the ALJ ultimately limited

---

[16] Elsewhere in his opinion the ALJ cited Dr. Lin's comment "that stress and lack of motivation resulted in some difficulty in the claimant's functioning.  However, I find that lack of motivation is not a medically determinable impairment to be addressed in a determination of disability.  Stress appears to be largely self-induced in maintaining unhealthy relationships and choosing not to work to have financial security." (Tr. at 41). Plaintiff persuasively points out that the ALJ's comments demonstrate a lack of understanding of adaptive functioning:  "the ALJ mischaracterized Dieter-Bradford's unhealthy relationships as a lifestyle choice as opposed to evidence of deficits in adaptive functioning. . . ." (Plaintiff's Reply at 6; *see also* Plaintiff's Brief at 14).

Plaintiff's RFC to unskilled work[17] where she would not be required to work in conjunction with others, (*see* Tr. at 40). *See Jones,* 149 F.Supp. 3d at 1261 (The ALJ's RFC assessment limiting the plaintiff to "only brief social interactions with co-workers and supervisors (because hearing and verbal comprehension deficits would preclude more frequent interactions) demonstrated that the plaintiff had deficits in adaptive functioning)); *see also* DSM-V (Intellectual Disability, Table 1), *available at* http://dsm.psychiatryonline.org. (for an individual with a mild intellectual disability, "competitive employment is often seen in jobs that do not emphasize conceptual skills[]" and support is generally needed "to learn to perform a skilled vocation competently.").

As to Plaintiff's ability to engage in activities of daily living and obtain a driver's license as relied upon by the ALJ, "courts have held that daily activities such as reading, driving, and cleaning are not necessarily inconsistent with mental retardation." *Huber,* 2010 WL 4684021, at *4 (citing *Lewis v. Astrue,* 2008 WL 191415, at *7 (N.D. Cal. Jan. 22, 2008 (collecting cases)). This is so because a claimant can satisfy Listing 12.05C without "having to demonstrate a disabling, or even severe, level of mental functional impairment." *Gomez,* 695 F.Supp.2d at 1057 (noting that for this reason, "the ALJ cannot disregard a valid IQ simply because other evidence in the record could support a finding of nondisability in the absence of such a score."); *see also Brown v. Secretary of Health and Human Servs.,* 948 F.2d 268, (6th Cir. 1991) (noting that "virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible)[]" and stating that the Commissioner "in promulgating Listing 12.05C expressly singled out individuals with Mild Mental Retardation.") (quoting DSM-III § 317.00) (emphasis omitted); *Huber,* 2010 WL 4684021, at *4 (same).

Finally, the fact that Plaintiff remained employed at Gray Metal Products for approximately one year does not constitute substantial evidence to conclude that Plaintiff

---

[17] "Unskilled work" is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. at §§404.1568(a), 416.968(a).

fails to meet the listing in light of Plaintiff's poor work history as a whole. The ALJ appeared to acknowledge that Plaintiff began to have problems at that work after six months. (*See* Tr. at 68 (ALJ asking: "So for at least six months you were able to work on that job without having any problems with coworkers or supervisors?")). Plaintiff ultimately walked off the job to avoid hitting her boss. (Tr. at 90). Importantly, "a work history limited to unskilled labor—or jobs that 'do not emphasize conceptual skills' or 'require limited conceptual and communication skills,' DSM-V at 34-35—is consistent with the deficits in adaptive functioning described by Listing 12.05(C)." *Ligon,* 2015 WL 5167873, at *6. *Cf. Brown,* 948 F.2d at 270 (plaintiff's "biography fits squarely within the DSM-III-R profile of a mildly retarded individual…" despite his having a driver's license and his abilities to make change at the grocery store, do his own laundry, clean his room, and work as a truck driver). Finally, where a claimant meets a listing, no further evaluation of the claimant's ability to work is necessary. *See Luckey v. U.S. Dep't. of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir. 1989) ("[T]he Secretary may not rely upon previous work history to prove non-disability where the section 12.05C criteria are met: When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap.") (internal quotation marks and citation omitted); *Huber,* 2010 WL 4684021, at *5 ("whether a claimant meets a listed impairment at step three of the evaluation process is determined without consideration of her 'age, education, and *work experience.*") (quoting 20 C.F.R. § 416.920(d) (emphasis in original). Moreover, "the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation." *Henderson v. Barnhart,* 349 F.3d 434, 435 (7th Cir.2003). In light of the record as a whole, the fact that Plaintiff, in her 42 years, once held down an unskilled job for one year does not constitute substantial evidence to support a non-disability finding in this case.

### b. ONSET PRIOR TO AGE 22

As to the determination whether the impairment existed prior to age 22, "[s]everal

Circuits have held that an adult IQ score creates a rebuttable presumption that the impairment existed before the age of 22." *Mathews,* 170 F.Supp. 3d at 1281 (citing *Hodges,* 276 F.3d at 1268-69 (IQ tests after age 22 satisfy the listing criteria and "create a rebuttable presumption of a fairly constant IQ throughout life."); *Luckey,* 890 F.2d at 668). Courts adopting the presumption have recognized that "[m]ental retardation is not normally a condition that improves as an affected person ages[]'", *Hodges,* 276 F.3d at 1268 (quoting *Muncy v. Apfel,* 247 F.3d 728, 734 (8th Cir. 2001)), and that "absence of IQ test in developmental years did not preclude finding of mental retardation predating age twenty-two and courts should assume IQ remained constant absent evidence indicating change in intellectual functioning." *Id.* (citing *Luckey,* 890 F.2d at 668). *See also* DSM-V (Intellectual Disability), *available* at http://dsm.psychiatryonline.org (explaining that "[a]fter early childhood, the disorder is generally lifelong, although severity levels may change over time."). Although the Ninth Circuit has not addressed the issue, several district courts in the Ninth Circuit have favorably adopted the rebuttable presumption, while others have declined to do so. *See Mathews,* 170 F.Supp.3d at 1281 (collecting cases); *Forsythe v. Astrue,* 2012 WL 217751, at * 7 (E.D. Cal. Jan 24, 2015) (same). If this Court were to adopt the presumption, then Plaintiff would be entitled to a rebuttable presumption that her IQ score obtained in 2013, when she was 42 years of age, is evidence of impairment prior to the age of 22.

The Court need not decide whether to apply the rebuttable presumption in this case because the record supports the conclusion that onset occurred in the developmental period and that the ALJ omitted discussion of that supporting evidence. Courts have "found that circumstantial evidence can infer a deficit in adaptive functioning prior to the age of twenty-two. Examples of such evidence include attendance in special education classes, dropping out of high school prior to graduation, difficulties in reading, writing or math, and low skilled work history." *Forsythe,* 2012 WL 217751, at * 7 (collecting cases). Here, Plaintiff repeated the second grade twice and required speech therapy and tutoring in reading. (Tr. at 84-85). She dropped out of school by the ninth grade. (Tr. at

58).  Further, Plaintiff's work history reflects that with the exception of her work at Gray Metal Productions, she was only able to hold a job for a few months at a time.  Plaintiff testified she had difficulty working as a cashier, keeping track of how much money she was supposed to have in the register and remembering which buttons to push.  Further, as the ALJ acknowledged, Plaintiff's checking account was closed due to bounced checks. (*See* Tr. at 42).  When working at the car dealership, Plaintiff had difficulty with paperwork and required assistance.  (Tr. at 61-62). Reading hurts her head.  (Tr. at 98). Nor is there evidence of a traumatic event that might have induced intellectual disability at a later stage in life.  *Cf. Markle v. Barnhart,* 324 F.3d 182, 188-89 (3rd Cir. 2003) (considering same, among other factors).

Here, the record as a whole supports the conclusion that Plaintiff's intellectual disability occurred prior to the age of 22.  *See e.g., Christner v. Astrue,* 498 F.3d 790, 793 (8th Cir. 2007) ("circumstantial evidence" supported manifestation of the claimant's intellectual disability before age 22, "including [the claimant's] low-grade dropout and participation in prior special education classes"); *Markle,* 324 F.3d at 189 (evidence that the claimant attended special education classes through the ninth grade, dropped out in tenth grade, "struggled" to obtain a GED, and had a limited work history supported a finding of onset before age 22); *Maresh,* 438 F.3d at 900 (ALJ erred in finding that the claimant's intellectual disability did not manifest before age 22 where the claimant attended special education classes, dropped out of school in the ninth grade, had "trouble with reading, writing and math," and had "frequent fights with other children.").  The ALJ's failure to acknowledge the evidence of record which supported the finding of onset before age 22 was improper.  *Cf. Day v. Weinberger,* 522 F.2d 1154, 1156 (9th Cir. 1975) ("an ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of supporting evidence").

Accordingly, in light of the substantial evidence of record as a whole, the ALJ's decision that Plaintiff did not meet Listing 12.05C was erroneous.

## V.    REMAND FOR AN AWARD OF BENEFITS

"'The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court.'" *Trevizo v. Berryhill*, __ F.3d at __ , 2017 WL 4053751, at *13 (9th Cir. Sept. 14, 2017) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)). "'[I]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded' for further proceedings." *Id.* (quoting *Garrison*, 759 F.3d at 1019).

Remand for an award of benefits is appropriate only where the following three prerequisites are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.[18]

*Garrison,* 759 F.3d at 1020 (footnote and citations omitted).    In evaluating whether further administrative proceedings would be useful, the court "consider[s] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103-04 (9th Cir. 2014).    Moreover, even when all three factors of the test are met, the "district court retains the flexibility to 'remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Id.* at 1102 (quoting *Garrison,* 759 F.3d at 1021)

Here, the ALJ erroneously rejected Dr. Crago's assessment with regard to Plaintiff's intellectual disability.  The ALJ also failed to discuss substantial evidence in

---

[18] The Ninth Circuit has noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Garrison,* 759 F.3d at 1020 n. 26 (citing *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir. 1996)).

the record supporting Plaintiff's claim that she met Listing 12.05C. Plaintiff applied for disability benefits over five years ago and the ALJ has already reconsidered the matter once upon remand from the Appeals Council. The record is fully developed and there is no serious doubt that once Dr. Crago's opinion regarding Plaintiff's intellectual disability is credited, and considered together with the record as a whole, that Plaintiff has shown at Step Three that she meets Listing 12.05C for intellectual disability. Therefore, Plaintiff is "presumed disabled, and no further inquiry is necessary." *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1990). *See also Zebley,* 493 U.S. at 532. Consequently, a remand for immediate calculation and award of benefits is proper.[19] *See e.g. Popa v. Berryhill,* __ F.3d __, 2017 WL 4160041, *6 (9th Cir. Sept. 20, 2017) (remanding for award of benefits where "there is no need for further proceedings."); *Erickson v. Shalala,* 9 F.3d 813 (9th Cir.1993) (remanding for an award of benefits where plaintiff, who was disabled under the Act, "ha[d] been waiting for well over four years for his disability benefits").

## VI. CONCLUSION

For the foregoing reasons, the Court remands this matter for immediate calculation and award of benefits. Accordingly,

IT IS ORDERED that the Commissioner's decision denying benefits is REVERSED and REMANDED for immediate calculation and award of benefits.

The Clerk of Court is DIRECTED to enter Judgment accordingly and to close the file in this matter.

Dated this 27th day of September, 2017.

Bernardo P. Velasco
United States Magistrate Judge

---

[19] Because Plaintiff prevails with her argument that the ALJ erred at Step Three, the Court does not address Plaintiff's other assertions of error.

- 24 -